## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 19-MJ-299-2** |
| | : | |
| **HAOTIAN SUN,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM
## IN SUPPORT OF PRETRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this memorandum in support of Pretrial Detention for defendant Haotian Sun ("Sun").

### I.      FACTUAL BACKGROUND

Sun has been a key member of a conspiracy to defraud Apple Inc. ("Apple"). Members of the conspiracy have received iPhones that were out-of-warranty and/or which contained counterfeit parts from Hong Kong ("suspected counterfeit phones") and returned those phones to Apple under the false pretense that they were under warranty and should be replaced due to malfunction or other reason.[1] As a result of the scheme, Apple records indicate that Sun and his fellow conspirators have defrauded Apple out of more than 2,700 new iPhones and attempted to defraud Apple out of more than 1,300 additional iPhones. Based on those numbers, the actual loss to Apple is estimated to be more than $1.5 million. The intended loss is over $2 million.

During the course of the government's investigation into Sun and his fellow conspirators' scheme, agents have intercepted shipments of suspected counterfeit phones bound for Wen Jin Gao

---

[1]The government fully incorporates by reference the facts set forth in the affidavit in support of the criminal complaint. ECF No. 1-1.

("Gao"), Sun, Dian Luo ("Luo"), Pengfei Xue ("Xue"), and other conspirators, recorded the International Mobile Equipment Identity ("IMEI") numbers on those phones, provided the IMEI numbers to Apple to see if the suspected counterfeit phones were returned to Apple, recovered trash from outside Gao's residence, performed surveillance, and executed search warrants. Agents also interviewed Sun about particular shipments of iPhones from Hong Kong, informed him that the phones were counterfeit, turned the phones over to him, and later found out that almost all of the phones were submitted to Apple for replacement.

### A.  Use of Multiple UPS Store Mailboxes

Apple flags potentially fraudulent warranty returns based on a variety of factors, which can result in Apple rejecting requests to repair and/or replace a phone from a particular individual or address. To circumvent this system, Sun and his fellow conspirators opened multiple UPS Store mailboxes in the D.C. metropolitan area during the course of the scheme and used those mailboxes (1) to receive shipments of suspected counterfeit phones from Hong Kong, (2) to ship the suspected counterfeit phones they received from Hong Kong to Apple for replacement, and/or (3) to receive replacement phones from Apple.

Sun opened eight UPS Store mailboxes in 2017 using his Maryland driver's license and university identification card.

### 1.  UPS Store at 8630-M Guilford Rd, Columbia, Maryland

On or about June 26, 2017, Sun opened a mailbox at the UPS Store on Guilford Road in his name. The mailbox service agreement showed two assigned mailbox numbers, 121 and 235, though 121 is crossed out. Shipping records indicate that between August 2017 and December 2017, there were approximately 24 shipments from Hong Kong to this UPS Store and that approximately 19 were sent to mailbox number 235 and approximately four were sent to mailbox number 121. Some shipments included the names "Hao Sun," "Jack Sun," and "Frank Sun."  The

contents of the packages included descriptions such as "Damaged Phone for Repair." Between August 2017 and October 2017, Apple records indicate that approximately ten replacement phones were shipped to this store; eight were sent to mailbox number 121; one was sent to mailbox number 235. The Apple replacement phones were addressed to "Hao Sun," "Haotian Sun," or "Frank Sun."

### 2.   UPS Store at 5305 Village Center Drive, Columbia, Maryland

On or about June 26, 2017, one day after he opened the mailbox on Guilford Road, Sun opened a mailbox at the UPS Store on Village Center Drive in his name. Shipping records indicate that between August 2017 and November 2017, there were approximately 15 shipments from Hong Kong to this address, some of which were addressed to variations of Sun's name. Apple records indicate that, between July 2017 and October 2017, approximately 15 replacement phones were sent to the mailbox that Sun leased. The replacement phones were addressed to "Hao Sun," "Haotian Sun," or "Frank Sun."

### 3.   UPS Store at 672 Old Mill Road, Millersville, Maryland

On or about July 17, 2017, Sun opened a mailbox at the UPS Store on Old Mill Road in his name. Shipping records indicate that between January 2018 and May 2018, approximately 17 packages were shipped from Hong Kong to this store. The addressees included "Frank S.," "Haoti Sun," and "Frank Sun." Apple records indicate that between July 2017 and September 2017, Apple shipped approximately 14 replacement phones to "Haotian Sun," "Hao Sun," or "Frank Sun" at this store.

### 4.   UPS Store at 6710-F Ritchie Hwy, Glen Burnie, MD

On or about July 17, 2017, Sun also opened a mailbox at the UPS Store on Ritchie Highway in his name. Shipping records do not show any shipments to the UPS Store from Hong Kong, but Apple records indicate that approximately 18 replacement iPhones were shipped to "Haotian Sun" or "Hao Sun" at this store between July 2017 and September 2017.

Between January 2018 and March 2018, Apple records indicate that Apple shipped approximately 85 replacement phones to Repair Facility 3. The repair orders that Repair Facility 3 submitted in conjunction with those phones listed the customer as "Jack Sun," a Google email address used by Sun, and a customer address of 6710F Ritchie Highway, i.e., the location of this UPS Store.

### 5.   UPS Store at 11101 Resort Road, Ellicott City, Maryland

On or about July 19, 2017, Sun opened a mailbox at the UPS Store on Resort Road. Approximately five months later, on or about December 28, 2017, he opened another mailbox at that store. Shipping records show shipments from Hong Kong to "Hao Sun" and "Ha Sun" at this UPS Store. Apple records also indicate that between August 2017 and September 2017, Apple shipped approximately nine replacement phones to the mailbox that Sun opened in July 2017. The shipments from Apple were addressed to "Haotian Sun" or "Frank Sun."

### 6.   UPS Store at 8480 Baltimore National Pike, Ellicott City, Maryland and Surveillance

On or about July 19, 2017, Sun opened a mailbox at the UPS Store on Baltimore National Pike in his name. Approximately five months later, on or about December 22, 2017, he opened another mailbox at this UPS Store, but used the name "Frank Sun" this time. Apple shipped a total of approximately 14 replacement phones to those mailboxes.

Between December 2017 and January 2018, shipping records show approximately 10 shipments from Hong Kong to this UPS Store. Law enforcement inspected five of those shipments.

On January 17, 2018, law enforcement inspected two packages at the DHL-BWI facility. One was addressed to "Hao Sun"; the other was addressed to "Fransis S." Each contained 26 iPhones. The packages were held at DHL-BWI for pick-up. On January 18, 2018, Sun picked up the packages and provided his driver's license. The IMEIs for the "Fransis S." package are

associated with far more than just 26 replacement phones. Apple provided data that at least 25 of these IMEI numbers are linked with phones that were returned through Repair Facility 3 by "Jack Sun." These IMEI numbers were also used to obtain additional replacement phones before January 2018. A majority of phones in the "Hao Sun" package also were returned to Apple through Repair Facility 3 by "Jack Sun."

On or about January 19, 2018, U.S. Customs and Border Protection ("CBP") inspected three outbound packages that had been returned to the sender by the UPS Store on Baltimore National Pike. The UPS Store had refused to allow Sun to pick up the packages because the names on the packages, "Fransis S" and "Hao Sun," did not match the name he provided on the mailbox rental agreement, "Frank Sun." The packages contained a total of approximately 63 suspected counterfeit iPhones. On or about January 31, 2018, law enforcement agents interviewed Sun in Washington, D.C., returned the phones to him, and informed him that the phones were counterfeit and not legitimate. Sun said his family runs a business in China that involves purchasing second-hand U.S. phones in America and then exporting them from the United States to China. He said when the phones break down after they are sold to customers in China, the customers take them back to Sun's family's business in China, which facilitates shipping the phones from China to Hong Kong to the United States, so Sun can take them to an Apple Store for repair or replacement. Once the phones are ready, Sun ships them back to Asia. Sun said each phone belongs to a person in China. He said he usually gets one or zero packages a month, which was not accurate based on shipping records. Sun said U.S. phones under warranty must be serviced in the United States, which also is not accurate. Despite the warning that the phones were counterfeit and not legitimate, according to Apple, approximately 57 of the phones were returned through Repair Facility 1 under email addresses either registered to Sun or known to be used by him, and all but three were

replaced. Apple confirmed that thirteen of the returned phones contained spoofed serial numbers/IMEI numbers.

### B.  Returning Phones Shipped from Hong Kong to Gao

Law enforcement intercepted seven shipments of suspected counterfeit phones from Hong Kong that were either addressed to Gao at a UPS Store mailbox that he leased or to a woman at a UPS Store mailbox that Gao controlled. The government detained one shipment of 22 suspected counterfeit phones. With respect to the remaining shipments, Apple reported receiving repair orders for phones through third-party repair facilities. The phones were submitted using email addresses that Sun is known to use.  Different names were associated with some of the returns, but "Jack Sun" was among the names used.

### C.  Inspection of Trash Left on the Curb Outside Gao's Residence

In November 2017, Inspector Cohen inspected two plastic bags of trash that had been left for collection at the curb outside Gao's residence. One bag contained small white boxes in which iPhones are usually packaged. The other bag contained AppleCare service letters, FedEx receipts, third-party Apple repair facility receipts, commercial invoices, and UPS labels. Some receipts contained names, phone numbers, email addresses, IMEI numbers, and serial numbers. Sun's name was found on items in the second bag, such as Repair Facility 3 repair orders for "Jack Sun" with an address of 6710F Ritchie Highway, the location of a UPS Store where Sun leased a mailbox.

### D.  Use of Multiple Email Addresses

Sun controlled multiple variations of a Gmail email address used to submit phones to third-party repair facilities. The government obtained search warrants related to these accounts. One of the accounts received numerous emails from Apple Stores in the D.C. metropolitan area, including stores in Georgetown, Annapolis, Clarendon, Columbia, and Fair Oaks. The emails related to, among other things, work authorizations for iPhones and notifications about phones being ready

for pickup. A review of emails also showed Sun receiving multiple packages at a UPS Store in Delaware, including more than 25 packages in February 2019.

### E.  Electronic Accounts – Spreadsheets, Search History, and Instant Messaging

A search warrant revealed that one of Sun's Google accounts included approximately 80 spreadsheets in his Google drive. The overwhelming majority of those spreadsheets contained information relevant to perpetrating the scheme to defraud Apple. For example, a spreadsheet that was last modified on May 9, 2018, consisted of 80 rows of information. Each row contained an IMEI number, an apparent serial number, and an email address ending in "hotmail.com." Most rows also contained what appeared to be an Apple repair order number.  The spreadsheet also listed Sun's UPS Store mailbox addresses in Ellicott City and Millersville.

Search history associated with one of Sun's Google accounts included searches for Apple authorized service providers; individual Apple stores, including ones in the D.C. metropolitan area and ones in Pennsylvania; and a website that allows individuals to enter IMEI numbers to have a phone model recognized and warranty information about the phone provided.

Instant messages recovered from a search warrant show Sun and Gao messaging each other frequently. In one of the earliest chats, Sun contacted Gao about a job. Within a month, on June 13, 2017, Sun and Gao discussed being "recognized" by Apple employees. One month later, on July 12, 2017, Sun and Gao discussed repair requests being denied by Apple because the parts inside the phone did not match the IMEI number. Then in August 2017, Sun noted that he had used the following names that day: "Hatoian Sun," "Haso Sun," "David Sun," and "Dave Sun."

### F.  Foreign Travel

Sun traveled to Africa in the summer of 2019. While he was in Africa, he emailed with one of the conspirators.

### G.  Status in the United States

Sun is a Chinese citizen. He is not a U.S. citizen and he is not a legal permanent resident. His sole job appears to be participating in a scheme to defraud Apple.

## II.  LEGAL STANDARD

### A.  Pretrial Detention Based on a Serious Risk of Flight

When the government seeks pretrial detention, as it does here, based on a serious risk of flight, the government must establish by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the appearance of the Defendant. *United States v. Bikundi*, 47 F. Supp. 3d 131, 133 (2014); *see* 18 U.S.C. § 3142(e)(1); *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987); *United States v. Vortis*, 785 F.2d 327, 329 (D.C. Cir. 1986). "That preponderance must, of course, go to the ultimate issue: that no combination of conditions—either those set out in the Bail Reform Act itself or any others that the magistrate or judge might find useful—can 'reasonably' assure that the defendant will appear for trial." *United States v. Xulam*, 84 F.3d 441, 442 (D.C.Cir.1996) (citing 18 U.S.C. § 3142(c)).

In determining whether any conditions of release will reasonably assure the appearance of the Defendant, the Court must consider the following four factors: (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the history and characteristics of the Defendant, including his character, physical and mental condition, family and community ties, past conduct, and criminal history, and (4) the nature and seriousness of the danger to the person and community posed by the Defendant's release. 18 U.S.C. § 3142(g); *Bikundi*, 47 F. Supp. 3d at 133.

### B.  Defendant's Citizenship from Another Country

The fact that a defendant is a citizen of another country is not by itself sufficient to find that he presents a flight risk. However, a defendant's citizenship status is one factor that a court should consider in determining whether he poses a serious risk of flight. In doing so, a court should

look to: (1) what ties the defendant has to the prosecuting jurisdiction, (2) what ties the defendant has to the country of his citizenship, (3) whether the United States has an extradition treaty with the country where the defendant is a citizen, and (4) the potential sentence the defendant would receive if convicted at trial.

In *United States v. Epstein*, 155 F. Supp. 2d 323 (E.D. Pa. 2001), the Court concluded that the defendant, a dual citizen of Germany and Brazil, should be detained pending trial for embezzling $6 million from his employer even though he confessed to the crime and paid the company back when he was confronted by it. The court noted that, despite the defendant's significant real estate holdings in the United States, his wife, children, and other family members lived in Brazil. The court rejected the defendant's assertion that a possible two-year sentence was not long enough to tempt him to abscond. *Id*. at 326. Two to four years in jail "is a sufficiently unpleasant prospect to persuade defendant under the present circumstances to exit the United States if he had the opportunity," especially considering the lack of extradition treaty between the United States and Brazil. *Id*. at 325-26. The court stated, "If he were to flee to his homeland, there is virtually no chance that he could ever be brought to justice in the United States." *Id*.

In *United States v. Tapia*, 924 F. Supp. 2d 1093 (D.S.D. 2013), the defendant, a foreign national who had an ICE detainer lodged against him, was charged with passport fraud. The defendant had lived and worked in South Dakota for approximately nine years, had children who were U.S. citizens living in South Dakota, and said he did not have money to leave the jurisdiction. The court concluded that although his immigration history was relevant to a risk-of-flight analysis, the ICE detainer was not dipositive and ultimately decided not to detain the defendant pending trial. In reaching its conclusion, the court stressed the defendant's length of time in the community and involvement at his children's schools. *Id*. at 1098. *See also Bikundi*, 47 F. Supp. 3d at 136

(noting that overseas ties, including a bank account, and a lack of legal status in the United States militate in favor of detention); *United States v. Giordano*, 370 F. Supp. 2d 1256, 1264 (S.D. Fla. 2005) (noting that relevant factors that support a risk of flight include the use of a number of aliases or hidden assets); *United States v. Shelikhov*, 468 F. App'x 54, 56 (2d Cir. 2012) (concluding that evidence supported a reasonable conclusion that flight to Ukraine would pose no personal or professional hardship on defendant, a naturalized U.S. citizen from Ukraine charged with health care fraud and money laundering offenses, when he had extensive ties to Ukraine, where his mother, fiancee's parents, and brother were believed to live).

## III.   ARGUMENT

The nature and circumstances of the offense, the weight of the evidence against the Defendant, and the Defendant's history and characteristics weigh in favor of detaining Sun pending resolution of his case.

### A.  The Nature and Circumstances of the Charged Offense

With respect to the nature and circumstances of the charged offense, the Complaint alleges that the Defendant and other conspirators engaged in a multi-year scheme to defraud Apple that resulted in a loss of more than $1.5 million. Conspiracy to Commit Mail Fraud is a serious felony offense and carries up to twenty years' incarceration upon conviction. *See United States v. Anderson*, 382 F. Supp. 2d 13, 15 (D.D.C. 2005) (citing "maximum penalty of 23 years" in support of detention). By its very nature, the scheme involved deception. It also involved the use of multiple names.

Conviction of the charged offense would result in a likely advisory sentencing Guideline range under the U.S. Sentencing Commission Guidelines Manual ("U.S.S.G") of between four and seven years in prison. Sun's offense level, if convicted at trial, absent any departures or mitigating circumstances, would potentially be 27. Conspiracy to Commit Mail Fraud has a base offense level

of 7 pursuant to U.S.S.G. § 2B1.1(a)(1). A sixteen-level increase applies because the loss is more than $1.5 million pursuant to § 2B1.1(b)(1)(I). Because a substantial part of the scheme was committed from outside the United States, namely Hong Kong, and the offense otherwise involved sophisticated means, a two-level increase likely applies pursuant to § 2B1.1(b)(10)(B)/(C). Because the offense involved the trafficking of unauthorized access devices, namely IMEI and serial numbers for in-warranty phones, a two-level increase likely applies pursuant to § 2B1(b)(11)(B)(i). At an offense level of 27, the resulting advisory guideline range is 70 to 87 months, assuming Sun is in Criminal History Category I. An offense level of 24, factoring in a three-level reduction for acceptance of responsibility, would still result in a recommended range of 51 to 63 months, i.e., a significant prison sentence. If a likely prison sentence of two to four years was "a sufficiently unpleasant prospect to persuade" a defendant to flee from the United States, especially to a country without an extradition treaty, clearly a lengthier sentence should provide even more of an incentive. Even if no enhancements applied, the offense level would be 23 if convicted after trial based on an expected loss of more than $1.5 million for the conspiracy, which translates into a range of 46 to 57 months, and 20 if convicted as a result of an early plea agreement, which translates into a range of 33 to 41 months.

Accordingly, the nature and circumstances of the charged offense weighs in favor of pretrial detention.

### B.  Weight of the Evidence Against the Defendant

The weight of the evidence against the Defendant also weighs in favor of pretrial detention. The evidence of the Defendant's guilt is extremely strong. It includes law enforcement agents actually meeting with him, telling him that phones were counterfeit, returning those phones to him, and then receiving information from Apple that almost all of those phones were returned to Apple despite law enforcement agents' admonishment to return the phones to the sender(s). The evidence

also includes the Defendant's UPS Store applications, emails that show the active use of additional UPS Store mailboxes, intercepted packages, data provided by Apple, emails informing him that packages were available for pickup at UPS Stores, Google searches relating to Apple Stores and IMEI numbers, spreadsheets containing IMEI numbers, and the use of multiple names as part of the scheme.

### C.  History and Characteristics of the Defendant

With respect to the history and characteristics of the Defendant, specifically his character, community ties, and past conduct, these factors also weigh in favor of detention.

Sun has not demonstrated that he warrants pretrial release. He participated in a sophisticated scheme to defraud Apple. He used multiple names in the process. This fraud scheme appears to be his only job.

Sun has no prior arrests and no failures to appear before court, but his community ties to the United States do not favor pretrial release. Sun is not a U.S. Citizen or a permanent legal resident. He is a citizen of China, a country with which the United States does not have an extradition treaty.

Given Sun's lack of citizenship in the United States, the lack of an extradition treaty with China, and the potential serious sentence that could result from a conviction in this case, pretrial detention is warranted.

### D.  The Nature and Seriousness of the Danger to Any Person or the Community That Would be Posed by the Defendant's Release

The government does not contend that Sun poses a danger to any person or the community.

**CONCLUSION**

For the reasons noted above, the government requests that the Court detain the defendant pursuant to 18 U.S.C § 3142(f)(2)(A).

Respectfully submitted,

JESSIE K. LIU
United States Attorney

BY:         /s/
Kondi Kleinman, Cal. Bar. No. 241277
Assistant United States Attorney
Ryan K. Dickey
Trial Attorney
555 4th Street, N.W.
Washington, D.C. 20530
Kondi.Kleinman2@usdoj.gov
Ryan.Dickey@usdoj.gov
(202) 252-6887 (Kleinman)
(202) 616-1509 (Dickey)